Richard G. THOMAS, Appellant,

v.

INTERNATIONAL INSURANCE
COMPANY, Appellee.

No. 5446.

Court of Civil Appeals of Texas,
Waco.

Sept. 11, 1975.

Rehearing Denied Oct. 9, 1975.

Bader, Wilson, Menaker, Cox & Branson, John B. Wilson, Jr., Dallas, for appellant.

Vial, Hamilton, Koch, Tubb, Knox & Stradley, C. L. Mike Schmidt, Jr., Merrick C. Walton, Dallas, for appellee.

## OPINION

JAMES, Justice.

This is a workmen's compensation case, and is the second appeal to come to this court. The first appeal was made by Plaintiff Thomas wherein he was awarded a take-nothing judgment against Defendant Insurance Co. See *Thomas v. International Insurance Co.* (Waco Tex. CA 1974) 507 S.W.2d 286, no writ history, in which the judgment of the trial court was reversed and the cause remanded for trial on the merits. There we held that the jury findings to the effect that Thomas had sustained no total incapacity and no partial incapacity following the injury in question were so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re: King's Estate* (Tex. 1951) 150 Tex. 662, 244 S.W.2d 660.

Since our first opinion the cause has been tried a second time, wherein another jury has reached similar findings, more particularly hereinafter pointed out. Pursuant to this second verdict, the trial court entered judgment for Plaintiff Thomas for $240.25, from which he appeals. We again reverse the trial court's judgment and remand the cause for another trial on the merits, for the reasons hereinafter stated.

Plaintiff-Appellant alleged he sustained a back injury while working for Neuhoff Brothers Packers, Inc., on December 28, 1970, which was a producing cause of total and permanent incapacity. The Defendant answered with a general denial. Trial was had to a jury which found:

(1) Plaintiff sustained an injury on December 28, 1970.

(2) Such injury was sustained while in the course of Plaintiff's employment by Neuhoff Brothers Packers, Inc.

(3) Plaintiff sustained no total incapacity following such injury.

(8) Plaintiff has sustained or will sustain no partial incapacity following such injury.

(19) Medical care was reasonably required as a result of the injury.

(20) The Defendant failed to furnish within a reasonable time medical care reasonably required as a result of the injury.

(21) and (22) That Plaintiff expended or incurred $240.25 as a result of such required medical care.

Based upon the jury verdict the trial court entered judgment for the Plaintiff for $240.25 and costs from which Plaintiff appeals on eight points of error.

By Plaintiff-Appellant's points 7 and 8 he complains that the jury's findings of no total (Special Issue No. 3) and no partial

incapacity (No. 8) and the findings of medical expenses in the amount of only $240.25 (No. 22) are so against the great weight and preponderance of the evidence as to be manifestly unjust. We sustain these points.

Plaintiff-Appellant Thomas was 37 years of age at the time of trial with a fourth grade education. He commenced working for Neuhoff Brothers Packers, Inc., in February 1967. At the time of the injury in question, he was working on an assembly line in what was called the "killing floor" of the packing plant, which killed and processed from 400 to 700 cattle per day. On December 28, 1970, Thomas was assigned to the job of cutting off the heads of the cattle carcasses on the assembly line. He injured himself when he caught the head of a carcass by the mouth in his left hand, severed it from the body with a knife in his right hand, and slung the cattle head around to put it on a de-horning table. This was heavy manual work, and this procedure was followed 400 to 700 times a day. However, on this particular occasion on December 28, 1970, when he turned to put a head on the de-horning table, he got a sharp pain in the lower part of his back. He kept working a little while longer, but "it got to hurting worse and worse." He reported his injury to Henry Gonzales, his foreman, who responded only by saying, "oh, shoot," and then turning and walking away. He traded jobs with another employee for the next few hours until quitting time, doing a lighter but bloodier type work. He had a lot of pain all night and called in for permission to see the company doctor the following morning. He called his foreman, Mr. Gonzales, on the telephone and sought permission to go to the company doctor, whereupon Gonzales hung up on him. He called Gonzales a second time and Gonzales hung up on him again. Thomas then went to the office of Dr. Cole, a company doctor; however, Dr. Cole refused to treat him because of company rules of Neuhoff that required him to get the approval of the foreman. After Plaintiff had been to Dr. Cole's office, he (plaintiff) reported to foreman Gonzales who replied, "I don't care what you do."

Plaintiff then sought legal counsel with respect to his claim and to his need for medical care, and commenced a course of treatment under Dr. Herbert Kresh of Dallas, Texas. Defendant International Insurance Co. was the workmen's compensation insurance carrier for Neuhoff. When it came to Defendant's attention that Plaintiff had been injured and was under the care of Dr. Kresh, Defendant's claims representative, James Bob Wilson, requested that Plaintiff be examined by Dr. Luedke, an orthopedic chosen by the Defendant. The examination by Dr. Luedke was admittedly for and in behalf of the Defendant. The Defendant Insurance Company secured an order of the Industrial Accident Board for Plaintiff to be examined by Dr. Luedke. Dr. Luedke's report and recommendations, and the fact that Dr. Luedke's examination was pursuant to an order of the Industrial Accident Board requested by Defendant were all excluded from evidence upon objection of Defendant's counsel. After receipt of Dr. Luedke's report of examination, claims representative Wilson authorized and agreed to pay for an electromyogram, following which Defendant's claims man Wilson received another report from Dr. Luedke. Dr. Luedke's first report stated that Plaintiff "may have some nerve root irritation," and recommended an electromyogram and possibly a myelogram. The electromyogram was performed by a Dr. Crane, who made a report to Dr. Luedke. Dr. Luedke then made a report to James Bob Wilson, saying "the EMG was suggestive of some nerve root irritation of L-5, S-1 and possibly in the lower dorsal area." He recommended hospitalization "if the patient is still having problems."

After the examinations by Drs. Luedke and Crane, the Defendant Insurance Co. requested that Plaintiff be examined by Dr. Morris Sanders, a Neurosurgeon, who examined Plaintiff on April 27, 1971. Dr. Sanders arranged for Plaintiff to be hospitalized at St. Paul's Hospital on July 13,

1971; however, Defendant refused to let Plaintiff be hospitalized and had same cancelled.

Plaintiff began to be treated by Dr. Kresh on January 4, 1971, a week after the injury. Between then and the time of trial Dr. Kresh had seen him seventy-three times for treatment, medications, examinations, and a back brace. Dr. Kresh testified that Plaintiff had sustained a ruptured intervertebral disc, that this is a condition that does not go away and does not repair itself, in which the symptoms come and go depending upon the pressure on the nerve, and in which it is not unusual for a person to have good days and bad days; that he had observed and treated Plaintiff for some three and half years and there was no change in his diagnosis, and that his diagnosis was verified by the consistency of his physical findings. He testified that in reasonable probability and to a reasonable degree of medical certainty, Plaintiff sustained an injury on December 28, 1970, that the injury was a ruptured intervertebral disc, that it was a producing cause of total incapacity which began December 28, 1970, and will be permanent and progressive. Dr. Kresh was the only medical doctor to testify. Although the Defendant employed at least three medical doctors to examine Plaintiff (Drs. Luedke, Crane, and Sanders), Defendant did not call any doctor to refute Dr. Kresh's testimony.

Dr. Kresh testified that his charges for his services (excluding charges for reports) was $1290.75 for his care and treatment of Plaintiff for his injury of December 28, 1970, and that same were necessary and reasonable. Further, that Plaintiff's care and treatment by Dr. Stonie Cotten, M.D. (an orthopedic physician) incurred an additional expense of $263.40 for such injury, which was necessary and reasonable.

From December 28, 1970, until September 15, 1971, Plaintiff was not able to work and was unemployed. He experienced a great deal of pain and did not feel like doing any sort of job. He tried to haul a little trash with an old pickup with the help of his wife, but was able to earn only about seventy dollars before expenses. With the help of the state unemployment office he got a job with Dallas Cap and Emblem Co. making $50.00 per week. Shortly after Christmas, 1971, he was sick with the flu for about a week, and when he returned to work he found that he had been replaced.

He was again unemployed until February 1972, when he began to work for J. C. Ammons doing landscaping work. Some days he felt like he could do a good day's work and other days he felt like doing nothing. After working all day he might be awake all night because of the pain from the day's work he had done. He did this work even though in pain much of the time, because he had a family to support and had to work. He did landscaping work until August 1972, when his back began to get worse.

He thereafter got a job as a forklift operator. He did this work with difficulty and with the help of associates, and continued to do this work to the time of trial. During this time he was under the treatment of Dr. Kresh, and lost a month from work obtaining treatment from Dr. Stonie Cotten, an orthopedist.

Cindy McCulloch, receptionist for Dr. Cotten, made the initial appointment for Plaintiff for March 7, 1974. She called Defendant the day before and obtained confirmation and authorization for examination and treatment of Plaintiff. Treatment by Dr. Cotten for Thomas continued through April 4, 1974. Dr. Cotten's first statement for services was sent to Defendant on March 25, 1974. After examination, X-rays, and physical therapy, Dr. Cotten's Operating Room Technician, Jim Bicknell, was told by the doctor that hospitalization was recommended for Plaintiff. Mr. Bicknell took Plaintiff's chart and Plaintiff to his office, called Defendant Insurance Co. and requested clearance for hospitalization. The request was denied. Subsequently a letter was received from J. B. Littrell, Defendant's claims service manager, saying no

authorization had ever been given for Plaintiff's treatment. Following this latest denial of hospital care for Plaintiff by Defendant, Plaintiff returned to and continued under the care of Dr. Kresh.

The testimony of Plaintiff and that of Dr. Kresh concerning Plaintiff's injury and its effect on his abilities was corroborated by other witnesses who were fellow employees. Joe Drake, a foreman at Whitaker Metals (where Plaintiff was employed as a forklift operator) testified that he had observed Thomas having difficulty doing his work, and that other employees helped Plaintiff with his work. Mr. Drake said as a foreman, with authority to hire and fire, and putting aside questions of friendship and charity, but based upon physical condition, he would not hire Plaintiff or anyone in Plaintiff's condition.

Robert Halcy, a fellow employee, testified he observed Plaintiff having difficulty pulling orders and picking up steel, and that he and other employees volunteered to help Plaintiff in his job. Halcy testified that he himself regularly carries the five gallon water jug for filling the radiator of the forklift ever since he noticed Thomas experiencing difficulty handling that part of the job.

Dr. Kresh testified that Plaintiff was working out of "sheer drive and motivation and out of actual physical need. . . . he has strong drive and motivation to be self-sufficient. So he works when he can and when he can't he has to stop."

The evidence showed that in July, 1966, Plaintiff sustained an injury to his neck, left lumbar region and low back while working for Acme Brick Company in Ellis County; and in August, 1969, while working for Neuhoff he sustained an injury to his left leg, left groin, left back lumbar area and neck. However, the pertinent evidence was to the effect that he had made recovery from these antecedent injuries and had been doing hard duty on a regular basis for Neuhoff for a substantial period of time prior to the injury in question of December 28, 1970.

The Defendant never made any effort to explain why they refused to furnish hospitalization to Plaintiff even though the three doctors employed by them who examined Thomas recommended hospitalization. Neither did they offer any doctor's testimony to dispute the clear opinion of Dr. Kresh concerning Thomas's disabilities as above pointed out.

In the light of the foregoing, we reverse the trial court's judgment and remand the cause for a new trial.

Since the cause is to be retried, we invite attention to certain events that transpired in the last trial complained of by Plaintiff's assignments of error, in the hope that same would not occur again.

By Plaintiff's Point of Error No. 4, he complains the trial court erred in admitting in evidence over Plaintiff's objection, hospital records containing medical opinions and conclusions, contradictory and controversial on their face, and not based upon reasonable medical probability. We sustain this point.

The Defendant offered into evidence all of the hospital records of Parkland Hospital pertaining to Plaintiff Thomas, to which Plaintiff objected on the ground that they contained diagnosis and conclusions that were contradictory and inconclusive, and also many entries of which had no relevancy to Plaintiff's injury in question or antecedent injuries. The Plaintiff also made a detailed motion to strike the records after they were admitted into evidence. The trial court admitted all of the hospital records in evidence. This was error. Many of these entries were manifestly not based upon reasonable medical probability. Since these records were voluminous, it would not be practicable to detail the portions which should have been excluded. However, as examples of the speculative and contradictory entries, in one place a "reporting physician" reached a diagnosis of "early stage of congestive heart failure", while another

summary concluded, "there were *no* signs of congestive heart failure." At another place in the records there was an opinion that Thomas had brucellosis, whereas at still another place an opinion entry recited that he did not have brucellosis.

Hospital records are admissible when properly proved up under Article 3737e, Vernon's Texas Civil Statutes, as business records. However, our Supreme Court has held that entries of hospital records are not admissible without exception; but they are admissible only in those instances where it can be said that the diagnosis records a condition resting in reasonable medical certainty. *Loper v. Andrews* (Tex.Sup.Ct.1966) 404 S.W.2d 300. Diagnostic entries in hospital records (even though properly authenticated) are not competent evidence of the condition they describe where they are genuinely disputed, and necessarily rest in expert opinion, speculation or conjecture. *Loper v. Andrews,* supra. Also see *Travis Life Insurance Co. v. Rodriguez* (Austin Tex.CA 1959) 326 S.W.2d 256, error refused NRE at 160 Tex. 182, 328 S.W.2d 434. Also, for a good discussion of this problem, although it did not involve hospital records but ordinary business records, see *Coastal States Gas Producing Co. v. Locker* (Houston 14th Tex.CA 1968) 436 S.W.2d 592, no writ history.

Plaintiff-Appellant's fifth point asserts the trial court erred in excluding the testimony and evidence offered on Plaintiff's bill of exceptions, which evidence established that Defendant had employed and authorized Drs. Luedke, Crane, and Sanders in connection with Plaintiff's claim of injury, and who recommended hospitalization; and by excluding such evidence, denied Plaintiff evidence admissible under an exception to the hearsay rule. We sustain this point.

As stated above, Drs. Luedke, Crane, and Sanders were all selected, authorized, and employed by the Defendant to examine Plaintiff. They each recommended that Plaintiff be hospitalized. Dr. Luedke wrote a letter to James R. Wilson, claims representative for Defendant dated March 23, 1971, in effect recommending hospitalization, after Dr. Crane's examination. Additionally, after Dr. Luedke examined Plaintiff, he told Plaintiff, "I know you have a problem, but before I can do anything about it, I will have to make a note to them and wait to see what they say. If they want me to see you again, I will." Plaintiff never heard anything more from Dr. Luedke. Dr. Sanders told Plaintiff he was going to make arrangements to put him in the hospital, which he did, which arrangements were later cancelled by the Defendant. The Defendant had authorized Dr. Cotten to examine and treat the Plaintiff, which arrangement was later repudiated and cancelled by Defendant, and Defendant refused to pay Dr. Cotten for his services rendered to Plaintiff.

Plaintiff tendered all this evidence in the trial to the effect that these doctors employed by Defendant had recommended that Plaintiff be hospitalized. The trial court excluded this testimony. This was error. These doctors, having been employed and authorized by Defendant to examine Plaintiff, were the agents of Defendant. Therefore, any out-of-court statements made by these doctors, written or oral, to the effect that Plaintiff should be hospitalized, were admissible against the Defendant Insurance Co. as an exception to the hearsay rule. These statements made by these doctors regarding the physical condition of Plaintiff were admissible. See *Texas Employers Insurance Assn. v. Dimsdale* (Dallas Tex.CA 1969) 440 S.W.2d 359, NRE; *Bituminous Casualty Corp. v. Jordan* (Waco Tex.CA 1961) 351 S.W.2d 559, no writ history.

As a related matter, and as a part of Plaintiff-Appellant's first point of error, in the jury argument Plaintiff's counsel undertook to show that Defendant had kept sending Plaintiff from doctor to doctor, and tried to comment on the failure of Defendant to call any of these doctors as witnesses. The Defendant objected to this argument on the ground it was hearsay. The trial

court sustained the objection, and excluded this argument. This was error. Plaintiff was entitled to call the jury's attention to the fact that these doctors employed by Defendant did not testify. *Meyer v. Great American Indemnity Co.* (Tex.Sup.Ct.1955) 154 Tex. 408, 279 S.W.2d 575; *Consolidated Underwriters v. Lowrie* (Beaumont Tex.CA 1939) 128 S.W.2d 421, writ refused.

Plaintiff-Appellant's sixth point of error complains of the trial court's permitting, over Plaintiff's objection, the changing of answers to certain interrogatories and requests for admissions, and in refusing to allow reference either to the original answers given or to the names of the persons giving the original answers, thus denying Plaintiff the opportunity and right to impeach the credibility of Defendant on a material issue, that of principal-agent relationship between Defendant and Dr. Morris Sanders.

In an effort to establish the principal-agent relationship between Defendant and Dr. Morris Sanders, a neurosurgeon, Plaintiff propounded his Interrogatory No. 21 to Defendant as follows:

"Did defendant, by and through an authorized agent and representative, request an examination of Richard G. Thomas by Dr. Morris Sanders . . . ?"

Defendant's answer to this question, sworn to by John B. Littrell, Jr., (Service Office Claims Manager for Defendant) was "yes."

Also, Plaintiff sought the same evidence by his Request for Admission No. 31:

"That the defendant herein has requested Dr. Morris Sanders to examine Richard G. Thomas."

The response thereto was "admitted" and signed by Mike Schmidt, attorney for Defendant.

After the trial was well under way, the Defendant's counsel moved the court to permit him to change the above answers by the filing of amended answers. That is to say, he wanted to change the answer of Interrogatory No. 21 from "yes" to "no", and have same signed and sworn to by James Bob Wilson, rather than by the signer of the original interrogatory, John B. Littrell, Jr. Defendant's counsel further wanted to change the answer of Plaintiff's Request for Admission No. 31 from "admitted" to "denied."

Defendant's counsel told the court that he had not learned the true facts "until last night," from information from Dr. Sanders' office. In order to verify to the court that his changed answers were "the true answers," without Littrell, he told the court: "I will have Dr. Sanders on the stand."

However, Dr. Sanders was not called as a witness, did not testify, and there was no showing any effort was made to obtain his testimony.

Acting upon the motion and statements of Defendant's counsel, the trial court permitted Defendant to change the answers as requested, and ordered Plaintiff's counsel to make no mention or intimation to the jury that the answers had been changed. And that is the way it took place before the jury. The changed answers were read to the jury and the jury was never informed in any way that the answers had been changed. By bill of exception it was proved through James Bob Wilson that he signed the changed answer upon the request of Defendant's counsel, because counsel told him the answer should be changed, based upon "the file information." Upon further cross-examination, Mr. Wilson said, "There is nothing in my file to show that my company authorized treatment by the doctor," and that his changed answer of "no" was based upon "a lack of information in the file." Wilson had never talked to John B. Littrell about changing this answer, and had not talked to anybody in Dr. Sanders's office about it.

The Plaintiff was prohibited by the trial court from showing the jury that the answers had been changed, and the background facts concerning the changed answers. Defendant-Appellee argues that

he had a right under Rule 168, Texas Rules of Civil Procedure, to make the change. It is true that Rule 168 as amended effective February 1, 1973, contains provisions for changing answers to interrogatories under certain conditions. It was pretty late in the game for Defendant to be requesting a change of the answers at all. However, assuming without deciding that the trial court's permission to change the answers was a proper exercise of judicial discretion, it was error for the trial court to forbid the Plaintiff from offering evidence to explain to the jury the reasons behind the changed answers. The Plaintiff should have been permitted to impeach the Defendant's changed answers by a showing of the former answers, as well as the purported basis for changing the answers, just as impeachment would be proper for any other prior inconsistent statement.

In view of another trial we add that it is our view that evidence of Plaintiff's prior drinking is too remote and is inadmissible.

For the reasons hereinabove stated, judgment of the trial court is reversed and the cause is remanded for trial upon the merits.

Reversed and remanded.